# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
### No. 18-1152V
### UNPUBLISHED

| | |
|---|---|
| ROBERT JAMISON,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Chief Special Master Corcoran<br><br>Filed: February 18, 2020<br><br>Special Processing Unit (SPU);<br>Findings of Fact; Onset; Influenza<br>(Flu) Vaccine; Shoulder Injury<br>Related to Vaccine Administration<br>(SIRVA) |

*Scott William Rooney, Nemes, Rooney P.C., Farmington Hills, MI,* for Petitioner.

*Althea Walker Davis, U.S. Department of Justice, Washington, DC,* for Respondent.

### **FINDINGS OF FACT**[1]

On August 8, 2018, Robert Jamison filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that his receipt of an influenza ("flu") vaccine on March 3, 2016, caused him to suffer a left-sided Shoulder Injury Related to Vaccine Administration ("SIRVA"). Petition at 2. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons discussed below, I find the onset of Petitioner's SIRVA occurred within 48 hours of vaccination. Specifically, Petitioner suffered pain within 48 hours of his March 3, 2016 flu vaccination.

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). I intend to post this ruling on the United States Court of Federal Claims' website. **This means the ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

I.      **Relevant Procedural History**

Mr. Jamison filed his petition for compensation on August 8, 2018. (ECF No. 1). By October 2018, Petitioner had filed all his relevant medical records and a Statement of Completion. (ECF Nos. 6, 12-17). After reviewing the medical records, Respondent filed a status report stating that he was not amenable to engaging in settlement discussions and requested 60 days to file his report pursuant to Vaccine Rule 4(c). (ECF No. 24). This request was granted.

On August 12, 2019, Respondent filed the Rule 4(c) Report maintaining that the case was not appropriate for compensation under the terms of the Vaccine Act. Respondent's Report at 1 (ECF No. 25). Respondent argued that "petitioner's contemporaneous records demonstrate that he did not seek treatment for his left shoulder pain until August 16, 2016, more than five months after vaccination." *Id*. at 5. Respondent further argued that had Mr. Jamison's activities of daily living actually been "drastically limited" as contended, he would not have waited five months to report his symptoms. *Id*. Thus, Respondent argued that Petitioner had failed to prove by preponderant evidence that his left shoulder pain and limited range of motion occurred within 48 hours of the flu vaccination. *Id*.

In a Scheduling Order filed on August 21, 2019, former Chief Special Master Nora Beth Dorsey (who was presiding over the case at the time) reported that she had reviewed the record and determined that an onset hearing was not necessary. (ECF No. 26). She also noted that because this anticipated ruling related to a discrete factual issue, party briefs were not necessary. *Id*. The parties were allowed the opportunity to submit additional evidence relevant to onset. *Id*. Pursuant to the Scheduling Order, Petitioner subsequently submitted an additional witness affidavit. Petitioner's Exhibits ("Pet. Ex.") 9-10 (ECF Nos. 27, 29).

The matter is now ripe for adjudication.

II.     **Issue**

At issue is whether the onset of Petitioner's shoulder pain was within 48 hours after vaccination as set forth in the Vaccine Injury Table. 42 C.F.R. § 100.3(a) XIV.B. (2017) (influenza vaccination). Additionally, the Qualifications and Aids to Interpretation ("QAI") for a Table SIRVA also requires that a petitioner's pain occur within this same time frame, 48 hours. 42 C.F.R. § 100.3(c)(10).

III.    **Factual history**

Mr. Jamison received a flu vaccine in his left shoulder on March 3, 2016. Pet. Ex. 1 at 1-2.[3] At the time of vaccination, Mr. Jamison was not employed. He had been previously employed performing mobile home maintenance. Pet. Ex. 2 at 1. Mr. Jamison

---

[3] Petitioner also received a Tdap vaccine in his right shoulder during this same visit.

stated that he suffered no pain or injury to his left shoulder prior to March 2016. *Id*. at 2. In his affidavit, he stated that the pain he experienced from the flu vaccine continued throughout the morning of March 3, 2016, and over the next few weeks. *Id*.

On August 16, 2016, approximately five-and-a-half months after he received the flu vaccine, Mr. Jamison presented to Jennifer Schiltzkus, PA-C ("PA Schiltzkus") for complaints of left shoulder and arm pain. Pet. Ex. 3. at 6. Mr. Jamison reported at this time that his shoulder pain was severe and began on March 3, 2016, "after flu shot on 3/3/2016 in left arm." Pet. Ex. 7 at 269. He rated his pain as a 10 out of 10 as the worst possible pain. *Id*. PA Schiltzkus documented that Mr. Jamison's pain:

> started in March after receiving a flu shot in his left deltoid. He said he has had residual persistent pain radiating down the lateral aspect all the way down into his ventral forearm and hand, at its worst it is 10 out of 10 and is never completely gone, but down to 1/10… He does not like taking medicine[s], did not take anything for it, just massages the area and tries to limit his movement. He reports being right-handed, but his ADLs [activities of daily living] have been drastically limited.

Pet. Ex. 3 at 6; Pet. Ex. 7 at 269. PA Schiltzkus listed the onset as "5 month(s) ago." *Id*. PA Schiltzkus also noted that Petitioner:

> did have marked pain today on exam with shoulder flexion, which was only about 90 degrees as well as external rotation and internal rotation. He was very limited in his movements. Weaker grip strength on the left as opposed to the right as well as decreased muscle mass in the left biceps versus the right biceps. He could have a component of brachial neuritis as he suspected. We will refer him for left upper extremity EMG to evaluate. We will also refer him to physical therapy for a full evaluation.

Pet. Ex. 3 at 8. Mr. Jamison was referred to physical therapy for treatment of severe left arm pain. *Id*.

On August 23, 2016, Mr. Jamison underwent an initial physical therapy evaluation. Pet. Ex. 3 at 20. The note from this evaluation stated:

> [t]he patient states that on 03/03/2016 he had a flu shot given to him in his left shoulder and a T-dap shot given to him in his right shoulder. He … had pain afterwards, but was told that it was normal and it would go away in a couple of days. The patient's pain in the right arm did go away; however, in the left arm never decreased. He states he is getting numbness and tingling sensations down into his forearm and part of the hand as well… The patient did state that after the injections on the same date, he was attempting to cut wood at home which may have exacerbated his shoulder pain. The patient states that he lives alone so he is responsible for doing all his own house and yard work.

3

*Id*. at 20-21.  Mr. Jamison explained that he had no prior issues with his left shoulder, and he was previously independent with all functional and recreational activities.  *Id*. at 21.  Since his shoulder pain began, he reported being limited in what he was able to do secondary to pain and decreased range of motion.  *Id*.  It was recommended that he attend physical therapy two to three times a week for the next four to six weeks.  *Id*. at 22.

On September 22, 2016, Mr. Jamison underwent an EMG study which yielded normal results.  Pet. Ex. 4 at 2-7.  Following the study, he was examined by Dr. Meihu Ma, who noted that Mr. Jamison had complained of "pain, weakness, and intermittent numbness of the left arm x6 months .... He has no symptoms on the right side.  He states the onset of his symptoms seem to follow a flu shot he received in March of this year…."  *Id*. at 1.

After 14 physical therapy sessions, Mr. Jamison was discharged on October 12, 2016.  Pet. Ex. 3 at 24.  It was noted that he:

> ha[d] begun to plateau with his physical therapy services.  The patient is continuing to notice gains but his gains are slower than expected and at this point it is believed that the patient will benefit from continuing his home exercise program independently as well as making a followup appointment with his referring physician for possible further diagnostic testing.  Due to this fact, the patient is being discharged from skilled physical therapy services at this time.

*Id*. at 25.  At the time of discharge, Petitioner's shoulder flexion range of motion had increased, and his internal and external rotation had improved.  *Id*.  He was still rated as having a 46% impairment in the shoulder pain and disability index (SPADI) and had only achieved one of the stated goals of physical therapy.  *Id*.

On November 5, 2016, Mr. Jamison underwent an MRI of his left shoulder.  Pet. Ex. 3 at 34-35. The impression stated, "[f]indings of patchy bone marrow edema in the proximal left humeral metaphysis and humeral head more prominent in the mid to lateral aspect. In the absence of acute injury infiltrative disease is a primary consideration. Neoplastic process or other causes of infiltrative disease would need to be considered… Mildly downward sloping acromion on with the study is otherwise unremarkable."  *Id*. at 15.

On January 5, 2017, Mr. Jamison presented to Dr. John Murphy, an orthopedic surgeon, at MidMichigan Medical Offices for complaints of left shoulder and upper arm problems.  Pet. Ex. 5 at 8.  Dr. Murphy noted that Mr. Jamison "reports no injury, but he did state that the problem began shortly after having a flu shot in the left upper arm.  He states that his arm was very sore the day following the injection and he states it progressively became worse."  *Id*.  Under "History of Present Illness," Dr. Murphy wrote

"60 y/o male in the office for left shoulder pain, which started on May[4] [sic] 3rd, the day of his flu shot which was given in his left arm." *Id*. Mr. Jamison complained that he continued to experience pain with his range of motion of the left shoulder. *Id*. Dr. Murphy ordered a repeat MRI in eight weeks and for Mr. Jamison to continue with his home exercise program and to hold off on formal physical therapy for the time being.

On February 23, 2017, Mr. Jamison returned to Dr. Murphy for "a recheck of the left shoulder and MRI result." Pet. Ex 5 at 1. Mr. Jamison continued to complain of limited range of motion of his left shoulder and weakness. *Id*. He reported to Dr. Murphy that he had completed 12 sessions of physical therapy but did not feel there was any improvement of his condition. *Id*. On examination, Dr. Murphy noted that Mr. Jamison's range of motion of the left shoulder was limited in all planes and he exhibited diffuse weakness. *Id*. at 3. Mr. Jamison tested positive in the Hawkin's and Neer shoulder impingement tests. *Id*. He received a steroid injection to the left shoulder to relieve his pain. *Id*. Mr. Jamison was instructed to follow up as needed. *Id*.

On May 22, 2017, Mr. Jamison presented to Dr. Phani Deepthi Vadlamudi, a family medicine physician at MidMichigan Health, for a follow-up visit for left shoulder pain after completing physical therapy. Pet. Ex. 3 at 1. Mr. Jamison reported that physical therapy had helped some, but that he continued to have pain with internal rotation and reaching above arm level. *Id*. He complained that due to his shoulder pain, he was unable to cut wood for the winter. *Id*. On examination, Mr. Jamison had a painful and restricted active range of motion of his left shoulder. *Id*. at 2. He continued to have positive results on the shoulder impingement tests including the Neer, Empty Can, and Arc tests. *Id*. An MRI of the left shoulder was ordered. *Id*.

On May 22, 2017, Petitioner was examined by Dr. Jeffrey Herman at MidMichigan Physicians Group. Pet Ex. 3 at 11. Dr. Herman noted:

> [h]e has had a flu shot done at health department along with a tetanus shot[5] in the left arm. Since then, he has had pain and later on weakness and inability with range of motion. The patient reports the initial flu injection was done in March. He actually called the health department to verify which injection he got in the left arm and they confirmed it was influenza vaccine. He finally asked for help with my PA in 08/2016 as the pain continued to get worse and he is unable to move the arm above shoulder level …. He continued to have decreased range of motion due to pain, so MRI of the shoulder has been ordered which showed a left humeral metaphyseal swelling, questionable infiltrative disease with normal rotator cuff. X-ray shoulder and bone scan has been ordered and he is here today for the results….

---

[4] This is a typographical error. Petitioner received the flu vaccination on March 3, 2016, not May 3, 2016. *See* Pet. Ex. 1 at 1.

[5] The tetanus shot was administered in Petitioner's right arm, not left as is indicated in this note. *See* Pet. Ex. 1.

5

*Id*.  In the summary of this visit, Dr. Herman stated that "[a]ll his symptoms started after influenza vaccine and he also has some deltoid muscle wasting, not sure if it is secondary to AC joint arthritis versus others.  He will be referred to orthopedics for further evaluation." *Id*. at 17.

Mr. Jamison filed an affidavit from his older sister, Linda Jamison, as Petitioner's exhibit 10.  In her affidavit, Ms. Jamison stated that she recalled in March 2016, and "many times thereafter", that her brother would complain of shoulder pain from a flu shot he had received.  She averred that in mid-March 2016, she saw and spoke to Petitioner who complained of pain in his shoulder.  *Id*. at 2.  She also stated that it was not unusual for Petitioner to not see a doctor for many months to complain about his shoulder as he "has always been very reclusive and not of sufficient financial means to afford medical care."  *Id*.  Ms. Jamison stated that she would have been one of the few people he confided in about his shoulder pain, which he did.  *Id*.

## IV.  Authority

Pursuant to Vaccine Act § 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act § 11(c)(1).  A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. § 13(b)(1).  "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium.  These records are also generally contemporaneous to the medical events." *Curcuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).  However, this rule does not always apply.  In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19.

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs*., 42 Fed. Cl. 381, 391 (1998).  The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs*., 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." § 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## V. Finding of Fact

First, I note that Respondent stated in the Rule 4(c) Report that "[i]t is improbable that the onset of petitioner's left shoulder pain and limited range of motion occurred within forty-eight hours of the flu vaccination." Respondent's Report at 5. The Qualifications and Aids to Interpretation for SIRVA, however, only state that Petitioner's *pain* must occur within the specified 48-hour timeframe, not the limited range of motion. 42 C.F.R. § 100.3(c)(10). Thus, this ruling only addresses whether Mr. Jamison's left shoulder pain occurred within the 48-hour timeframe after he received his flu vaccination.

After a complete review of the record including all medical records, affidavits, Respondent's Rule 4(c) Report, and additional evidence filed, I find that Petitioner's onset of left shoulder pain more likely than not occurred within 48 hours of his receipt of the flu vaccination. Specifically, I base this finding on the following evidence:

- On March 3, 2016, Petitioner received a flu vaccine intramuscularly into his left shoulder. Pet. Ex. 1 at 1-2.

- Petitioner had no history of left shoulder injury prior to this vaccination. Pet. Ex. 2 at 2.

- On August 16, 2016, Petitioner presented to PA Schiltzkus for complaints of left shoulder and arm pain which he reported began on March 3, 2016, "after flu shot on 3/3/2016 in left arm." Pet. Ex. 7 at 268. PA Schiltzkus documented that Mr. Jamison's pain started in March after receiving a flu shot in his left deltoid.

- On August 23, 2016, Mr. Jamison underwent an initial physical therapy evaluation. Pet. Ex. 3 at 20. The note from this evaluation stated "[t]he patient states that on 03/03/2016 he had a flu shot given to him in his left shoulder and a T-dap shot given to him in his right shoulder. He … had pain afterwards, but was told that it was normal and it would go away in a couple of days." *Id.*

- On September 22, 2016, during an examination by Dr. Ma, Mr. Jamison was noted to have "pain, weakness, and intermittent numbness of the left arm x6 months…. He has no symptoms on the right side. He states the onset of his symptoms seem to follow a flu shot he received in March of this year…" Pet. Ex 4 at 1.

- On January 5, 2017, during an examination by orthopedic surgeon Dr. Murphy, it was noted that Mr. Jamison "reports no injury, but he did state that the problem began shortly after having a flu shot in the left upper arm. He states that his arm was very sore the day following the injection and he states it progressively became worse." Pet. Ex. 5 at 8. Under "History of Present Illness", Dr. Murphy wrote "60 y/o male in the office for left shoulder pain, which started on May[6] [sic] 3rd, the day of his flu shot which was given in his left arm." *Id*.

- On May 22, 2017, during an examination by Dr. Herman at MidMichigan Physicians Group, Dr. Herman noted that Mr. Jamison "has had a flu shot done at health department along with a tetanus shot[7] in the left arm. Since then, he has had pain and later on weakness and inability with range of motion. The patient reports the initial flu injection was done in March. He actually called the health department to verify which injection he got in the left arm and they confirmed it was influenza vaccine. He finally asked for help with my PA in 08/2016 as the pain continued to get worse and he is unable to move the arm above shoulder level …." Pet Ex. 3 at 11. In the summary of this visit, Dr. Herman stated that "[a]ll his symptoms started after influenza vaccine …." *Id*. at 17.

- Mr. Jamison filed an affidavit from his sister who averred that she saw Petitioner in March 2016 and recalled that he complained of shoulder pain from a flu shot he had received. Pet. Ex. 10. She also explained that her brother was the type of person who would not see a doctor immediately to complain of symptoms such as shoulder pain. *Id*. at 2.

The above medical entries are consistent with Petitioner's affidavit testimony that

---

[6] Petitioner received the flu vaccination on March 3, 2016, not May 3rd. *See* Pet. Ex. 1 at 1.

[7] The tetanus shot was administered in Petitioner's right arm, not left as is indicated in this note. *See* Pet. Ex. 1.

his left shoulder pain began at the time he received the flu vaccine on March 3, 2016. I find the sworn testimony of Petitioner and his witness to be credible and in agreement with the contemporaneously created treatment records. In addition, all subsequent medical records (generated prior to the claim's filing) are consistent with his contentions. As such, I find preponderant evidence that the onset of Petitioner's left shoulder pain occurred within 48 hours of his March 3, 2016 flu vaccination.

I acknowledge that the five-month records gap from vaccination to the first efforts to treat Mr. Jamison's alleged shoulder pain somewhat undermines Petitioner's onset contentions. It is reasonable to expect that the average Program claimant might seek medical treatment sooner if in fact the person was experiencing sudden post-vaccination pain. However, the August 16, 2016 record does allow the inference that Petitioner (whether because he lacked insurance, since he was unemployed when he received the vaccine, or simply did not prefer medical intervention) may have avoided seeking medical care despite the symptoms he was experiencing. *See, e.g.*, *Williams v. Sec'y of Health & Human Servs.*, No. 17-830V, 2019 WL 1040410, at *9 (Fed. Cl. Spec. Mstr. Jan. 31, 2019) (noting a delay in seeking treatment for five-and-a-half months because petitioner underestimated the severity of her shoulder injury); *Tenneson v. Sec'y of Health & Human Servs.*, No. 16-1664V, 2018 WL 3083140, at *5 (Fed. Cl. Spec. Mstr. March 30, 2018), *review denied*, 142 Fed. Cl. 329 (2019) (finding a 48-hour onset of shoulder pain despite a nearly six-month delay in seeking treatment); *Marino v. Sec'y of Health & Human Servs.*, No. 16-622V, 2018 WL 2224736, at *2 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (noting a delay in seeking treatment for several months due to petitioner's work schedule and difficulty making appointments); *Knauss v. Sec'y of Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (noting a three-month delay in seeking treatment).

In addition, the consistency of Petitioner's reporting onset once he did begin treatment helps to overcome the initial treatment gap. Not every significant temporal lag in a SIRVA case can be remedied in this manner; a gap of a few months more might tilt the balance against the Petitioner's onset contentions. But here, the facts sufficiently preponderate, if barely, in Petitioner's favor on the question of Table SIRVA onset.

## VI.    Scheduling Order

Given my finding of fact regarding the onset of Mr. Jamison's pain, Respondent should evaluate and provide his current position regarding the merits of Petitioner's case.

**Accordingly, Respondent shall file, by no later than April 7, 2020, an amended Rule 4(c) Report reflecting Respondent's position in light of the above fact-finding.**

9

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
